Whenever you're ready.May it please the Court, I'm Lisa Mathewson here today representing Appellant Christopher Wright. Your Honor, we request permission to divide the argument. Somewhat unusually, we have would suggest that we will divide the argument rather than by client, by issue. That's fine. Because many of the issues are in comment. I will start by I have requested 15 minutes of time for those arguments. Mr. Goldberger will be addressing the traditional mail fraud count, count 12, and has requested 10 minutes from which he will reserve 3 minutes for rebuttal.Who's going to address the spillover issue?That will be Mr. Goldberger. Okay.And Ms. Brotman will be arguing third and we have allocated 5 minutes to her argument. She'll address factual issues that are specific to her client, Andy Teitelman, as well as any of the sentencing issues on which the Court would like to hear argument.Your Honors, at a minimum, the skilling error here, which the Government has conceded, infected the entire verdict and requires a retrial.So that the issue is not spillover. The spillover issue, that is the Riley-Pellullo issue, relates to whether the honest services fraud error requires retrial on the traditional mail fraud counts as well. With respect to the skilling error itself, that of course infected the honest services fraud counts. And I am addressing the effect of the skilling error with respect to how the Court charged the jury. But the Government in its closing really relied heavily on just bribery. I mean, they mentioned it like 20 or 30 times or something. Does it require a retrial in those circumstances?It does, Your Honor, because although the Government understandably emphasized bribery, which is a phrase that the panel in the unpublished Coniglio decision used, the Government clearly told the jury, and so did the trial court, that it could convict on either the bribery theory or the conflict of interest theory. In fact, when one examines the jury instructions, one sees that the weight of the instructions to the jury actually tilted more strongly toward the conflict of interest theory.So is it dispositive really that the jury was charged on both? Essentially, yes, Your Honor.And you get a general verdict, of course.Yes, a general verdict. And in fact, the indications here, Your Honor, go beyond even the jury charge. This jury, which deliberated for somewhere around five days, requested specifically from the trial court the opportunity to examine the State Ethics Act, but only the provision dealing with the conflict of interest provisions.In fact, the jury actually acquitted on every single count that alleged an official action by Mr. Wright. Every time the jury was asked to consider whether Mr. Wright had engaged in an official action, essentially in exchange, and we'll get to that in the context of bribery, the jury said no. The jury convicted only on the counts that alleged mailings that were unrelated to official action by Mr. Wright.When one examines the pattern of the verdicts, especially in conjunction with the questions that the jury asked during deliberations and the weight of the court's jury instructions, one sees that it is impossible to say beyond a reasonable doubt that this error, the skilling error, did not infect the verdict.Now, we...Did you just say that it has to be beyond a reasonable doubt that it didn't infect? Okay.Yes, Your Honor. We contend that we are not here on plain error. We believe that under the standard articulated in the Conrad Black case for preservation of skilling error, our objections to the scope of the honest services fraud instruction in the court below, which incorporated as well arguments that we had made at the motion to dismiss stage, all of which are in the Supreme Court's briefing, that it believes we are here on plain error, but at the same time it cites the Supreme Court's neater decision, which is a pure harmless error case. So regardless of what the government's position is on that, we believe that we're here on harmless error, but even on plain error, Your Honors, the standard is whether the court can say beyond a sufficient acquittal based on skilling. Rather, you're seeking a retrial. We are arguing that there should be an outright acquittal, Your Honor, for a separate reason. Now, I started by saying... That's your sufficiency of the evidence argument. Yes, and constructive amendment. Okay, but based solely on skilling, assuming that the evidence is sufficient, retrial. Skilling, Your Honor, informs the court's ability to apply a sharp eye to the distinction between bribery and conflict of interest. And so the impact of skilling is to focus the court and the parties on the need to sharply delineate the distinction. Now, the court has recently reaffirmed in the Bryant decision the centrality of the intent to be influenced or to influence to a quid pro quo bribery analysis. And as the court noted in Bryant, the intent to be influenced or to influence is equivalent essentially to an intent to alter an official action. Not to be clear, an actual alteration in the official action, because mail fraud does not require the completion of the scheme. But the criminal intent that is essential to a bribery theory of honest services fraud is the criminal intent to be influenced on the part of the public official. The context in which that arises, again, reaffirmed in Bryant and arising out of the Kemp decision, is that when a public official intends to take an action that he has already determined to take, that is just to keep doing what he's been doing all along, he does not intend to be influenced in his official action. And that's the salient point for analyzing the evidence on the sufficiency issue in this case. Because the government states in its brief that Mr. Chawla and Mr. Teitelman showered benefits on Mr. Wright, and at the same time, and that's a critical failure of proof in this case, which precludes retrial on the honest services fraud theory, is the failure to establish an intent to be influenced or an intent to be influenced by Mr. Wright or his co-appellants. We're aware, Your Honors. If they failed to establish, why was there a conviction? Because, Your Honor, the pattern of the verdict shows that the jury convicted on the conflict of interest theory. And that's why the skilling error at a minimum requires retrial, but the pattern of the verdicts also. I'm sorry? You said at a minimum. One might differ from that. Just say it just requires a retrial. You take out the bad, you put in the stuff that's allowable, and you see how it comes out. Your Honor, the insufficiency of the evidence of the critical intent to be influenced or to influence is the failure that would preclude retrial here, as does the constructive amendment, because we contend that as to most of the benefits, bribery was never alleged, and certainly our clients could not be retried. I mean, the government would say, look, no matter how you slice it or dice it, there's a quid, there's benefits to right, and then there's benefits to go back to challah and entitlement. That is what the government would say, Your Honor, and that's not enough, because it's not just a quid and a quo. It's a pro, and the pro has been repeatedly reaffirmed, including most recently by the Siegelman Court in the 11th Circuit, by the First Circuit in the second Urquioli decision, and by this Court in Bryant. The need for the link between the benefit and the thing of value is the conflict of interest. The temporal overlap between the thing of value and the official action is a conflict of interest theory, where the government's proof fell down here is on the link between the two. Now, the Court in Bryant found that the timing of the benefits and the official action was sufficient in that case to permit an inference of a linkage, but the link was much closer in Bryant. In fact, as the opinion notes, six days between the time of Mr. Bryant's hiring and the time that he sat down with his new employers to discuss the school's need for supplemental funding. Bryant was a more stark case, but this has subtleties, but what the government is saying is despite the subtleties, despite the nuances, we can prove that there was a quid pro quo. Go ahead. Here's why they can't, Your Honor, a couple of critical distinctions with Bryant that undercut the pro in the quid and the quo. One is that Mr. Wright, the testimony unrebutted out of the prosecution witness's own mouth, Mr. Wright had no discretion to decide whether to take these official actions that benefited Mr. Chawla. Mr. Wright's job had as its central function constituent service for major developers. Now the government cites just for one example the first clause of one sentence of testimony by Mr. Wright's boss, Jack Kelly, and doesn't cite the second clause of the sentence where he says that in fact Mr. Wright did routinely provide constituent service. And the court must, of course, examine The point the government's making is look, okay, fine, there's people that really good chiefs of staff who are for a pro-development councilman in this case. Sure, they're going to go the extra mile to see if development can occur, but those people don't get free apartments, they don't get all these other things that were given, free counsel in a divorce proceeding, they don't get those things. And you can say, whoa, those are gratuities, those were what friends like Mr. Teitelman did for Mr. Wright, and they're saying, well, let's let a jury decide. And the jury decided it. But, Your Honor, the jury did decide and that's why we're here. Now, two points on the jury's decision, however. One, again, the jury did reject it, acquit it on every single count involving an official action. Second, the entire premise of sufficiency review is that we're examining whether the jury verdict was supported by the evidence. And so to simply say the jury decided doesn't answer the question of whether the evidence supported the jury's verdict. Now, Mr. Wright received these benefits unlike, as Your Honor hypothesizes, others, which may have given rise to a conflict of interest, probably did give rise to a conflict of interest. But unless he intended to exchange his official action for them, he's not guilty of honest services brought after skilling. The discretion, or lack of discretion, Your Honor, is important in the framework of Bryant and Kemp, because it shows that he had, in fact, already determined to take these actions because his boss said he'd be disciplined if he had not. And so there is no permissible inference of an intent to be influenced, that is, an intent to alter his official action. It sounds as if through the back door you're arguing sufficiency of the evidence. But at this point, in the limited time you have left, do you want to address constructive amendment? Yes, Your Honor. On a related point, the indictment alleged that Mr. Chawla and Mr. Teitelman conferred these benefits on Mr. Wright, quote, in order to secure his official action. In order to is not bribery language under any decision of this Court. Are you saying that the government and its charging documents need to use the words bribery and quid pro quo? Your Honor, the government needs to use the word exchange and or intent to be influenced, because that's what this Court's jurisprudence has said for quite a long time, at least going back to Kemp and really originating with Antico before then. In order to, Your Honor, is motive language, really, primarily, rather than intent language. And averring the motive for the payment of benefits is not sufficient to allege the specific intent. Moreover, with respect to Mr. Wright himself, the important point is there was no allegation at all of intent by Mr. Wright. This indictment alleged the reason that the Chawla brothers and Mr. Teitelman conferred the benefits on Mr. Wright never alleged any intent with respect to Mr. Wright himself. And that You're saying that order to doesn't connote intent and exchange? Yes. Simply motive. Simply motive. Because in order to is very different, Your Honors, than with the intent to influence. And, for example, the Siegelman decision in the Eleventh Circuit actually disapproved the language in return for and said that in return for does not even adequately allege a pro. And in order to is certainly much less specific than in return for, which at least connotes an exchange. And if that's insufficient under Siegelman, then this court should consider that as persuasive as well. Now, and again, as to Mr. Wright, there was no allegation at all whether he did anything in order to do anything else. The indictment simply alleged, as the government continually states here, that he performed these official actions at the same time as receiving the benefits. Your Honor, this court's case law is on a continuum, the post-Skilling case law. The Riley decision, one of the first to come out, involved a pure conflict of interest theory. Bryant involved a pure bribery theory. This case is in the middle with the unpublished decision in Coniglio. The jury was instructed that it could convict on both theories the government's was exceedingly weak, and we contend insufficient to sustain the verdict. At a minimum, that will require retrial, and yet the salient issue before the court is whether retrial is barred as a result of the insufficiency or the constructive amendment. Thank you. Mr. Goldberger? May it please the Court, my name is Peter Goldberger. It's my privilege to represent the co-appellant, Ravi Chawla. Now, Ms. Mathewson, did you reserve any time for rebuttal? We've reserved three minutes from our collective 30 minutes. Okay. Got it. And that's, in a sense, being taken off my 10, but really I just have a seven-minute segment. No problem. We'll do three minutes of rebuttal, wherever it appears to be needed. And you're going to deal with the spillover issue? Right. The two count 12 issues, which is the spillover and the separate sufficiency with respect to count 12, which is the pure mail fraud count. And if I may, I'd like to start with the insufficiency, although I can hear that that's not what you mostly want to hear, but let me go there first because it's the greater relief. I will address the spillover. Now, insufficiency argument you're making on behalf of Mr. Chawla? Yes. No, this is applicable to all three. All three were convicted on this count, and almost all of the reasons why the evidence was insufficient are applicable to everyone. All right. Okay. The allegation of count 12 was that the three defendants schemed to defraud PBRG, the buyer of a building at 2000 Delancey Street, by placing Christopher Wright in a vacant apartment in late May of 2006 with the expectation that he would not pay rent, and concealing that fact, the fact that the apartment was occupied by a squatter when the building was sold in early June of 2006 to PBRG. It's a fanciful theory at odds with nearly all the facts. It was a theory twisted to make this into a federal case for something which is just not a federal case. And you can tell that from the fact that the only mailing occurs almost a year later to find a mailing to make this a mail fraud. They had to go a year down the pike. There is no evidence. Let's start with Ravi Chawla. The mailing was the email. What's that? The one email exchange. No, this is a letter, a cover letter, transmitting to PBRG's lawyer the answer to an email campaign. But it's technically enough. Yeah, sure. It's technically enough if it's in furtherance, if it's for the purpose of executing the scheme, which we'll say it isn't, which we have said it isn't. I just think that, you know, when you've got a concealment in May of 2006 and a letter in May of 2007, your eyebrows go up about whether you've got a mail fraud. There is no evidence that Ravi Chawla had any knowledge, any involvement, certainly had no role in devising any so-called scheme of this kind. There was no evidence of Ravi Chawla's involvement in any such scheme at all, and that's without Ravi Chawla. This is now about everyone. The evidence contradicted the theory of the indictment of fraud by active concealment, active concealment from PBRG. Andy Teitelman openly negotiated placing Christopher Wright into that apartment with the then owner, Ginkgo Corporation, including drafting a lease for that purpose. The government presented a rent roll that is, you know, a rundown of who's living in it. This is just a six-unit building. This is not a giant high-rise or something, okay? Called Exhibit 5B at around the time of the closing on the building, supposedly to prove, you know, that Wright is not listed there, without any evidence that any one of the defendants was involved in any way with the writing up of that document, of Exhibit 5B, or decision to present it. There's just a complete absence. People with actual knowledge of that question testified, and the prosecutor never asked them a question about it. Soon, if not immediately after settlement, the agent for the buyer, Mr. Fabish, inspects. It's only his six units. He sees Christopher Wright living there. He gives his approval and permission for Christopher Wright to stay, if he promises to leave when asked. I mean, if there was a concealment, a scheme to conceal Christopher Wright living there from PBRG, they would have pretend, you know, he wouldn't be there around the time of closing. He would vacate the place, and it would look like it was vacant. It only had to look like it was vacant for 15 minutes. But here he is. And within a couple of weeks, Christopher Wright, the concealed tenant, calls the management company and complains about the plumbing. He's hardly concealing his presence there. Although the government would, I would imagine, argue at trial, that that was just arrogance. You know, I'm looking at the totality of the evidence and asking, can a reasonable jury find a scheme to defraud the buyer of this building by where is this tenant in one of the six apartments? It just is, it's not sufficient evidence. The point is that that argument was made to the jury, wasn't it? Sure. And the evidence was insufficient to support the conviction, and that's a valid basis to reveal, as Ms. Matheson correctly answers. You have less than two and a half to go. I'm sorry. Yes. And finally, I just want to say on this, without developing it, that we also contend, and refer you to the briefs on this, that the mailing is not in furtherance of any scheme to conceal when you mail to the supposed victim a legal document saying, he has a right to be there. That certainly doesn't further a scheme to conceal from the victim. So the spillover is about if the evidence is sufficient, but the honest services convictions are all reversed, should the non-honest services fraud conviction, which is count 12, also be reversed? That's the spillover question. And the government concedes that at least step one of this analysis is, was there at least some evidence admitted on the invalid counts that would not be admissible at a trial on the valid counts? The government concedes that's so. We've got the two expert witnesses about the ethics laws. They don't concede that we win step one for some reason that I don't really understand, but they concede that there is this additional evidence. Then you look, if you get past step one, there's a four, and that shows there's spillover, step one. Then the question is, was the spillover prejudicial? And that's a four-part question under this Court's cases. I don't suppose it's mechanical, but it's a general test that we look at, whether the spillover was prejudicial. Was the evidence, even if technically sufficient, intertwined and not sufficiently separate? Here the evidence was intertwined in a remarkable and unusual way because we have count 10, an honest services fraud count, which is the same mailing. That is, the mailing of this complaint is alleged to be in furtherance of the honest services fraud count as well. So necessarily the government's evidence about right in the apartment, placing him in the apartment and keeping him in the apartment, is about both theories. And that evidence is intertwined by the very theory of the case. Second, the evidence that is distinct to count 12 was barely sufficient. Third, if it was sufficient at all, that's a relevant factor for prejudice. Third, the defense strategy would have been different, is the question, would it have been different? Here we have a case where three defendants chose to testify, one did not. The one who didn't testify got acquitted. If it weren't for all those other counts, if I, may I finish this? Go right ahead. If it wasn't for all those other counts, I suggest to you that the other three would not have testified. Let me ask you, I mean, with this, if there was error here, would it be harmless? I mean, count 12 was discreet, was not really dependent on convicting on other charges, and the jury received a separate instruction with respect to this count. Yes. How do you respond? Well, that's exactly what I'm arguing. That's the four-part test is the answer to that question. That's the Riley-Pellullo test for answering that exact question. The government does start, and I'm glad you brought that up, with the idea that, well, there was a separate jury instruction on count 12. I don't think there's ever been a federal criminal trial in which there wasn't a jury instruction on each count. If there wasn't, that would be an issue for appeal. I mean, it seems to me that that proves too much to say that's an important factor. The factors that are important are the four that I was elaborating, I was on the third, and the fourth and final one is to look at the prosecutor's closing argument. And here we have the prosecutor using strong language about corruption, integrity, honest services in closing. This is the emotional appeal of the prosecutor's closing, is about the honest services theory, not about how the jury should be outraged that this company from New York got defrauded in a $20,000 real estate deal because somebody didn't tell them that two of the six apartments were occupied instead of one of the six. Thank you. Thank you very much. Ms. Brotman? Good morning, Your Honors. I'm Ellen Brotman, and I represent Andrew Teitelman, and I'll be focusing on the sufficiency of the evidence as it relates to Mr. Teitelman's convictions on counts 1, 10, and 12. If there is time or the Court has questions, I will also be happy to address our shared sentencing arguments. As the Court correctly pointed out during Ms. Mathison's argument, there are councilmen and city employees who provide constituent services to developers. Isn't your big argument about the presence of Mr. Wright in the apartment? I think on counts 1 and 10, which are honest services fraud counts, my argument is that, as Ms. Mathison argued, there was no intent for Mr. Teitelman to give the benefits that he gave to Mr. Wright for any reason. I was thinking this would be what? Wouldn't this be traditional property or traditional fraud under count 12? Count 12 is a traditional fraud. I'm just saying, in other words, I thought the question I have is that under the traditional fraud count, your brief emphasizes that Teitelman, like the other defendants, made no secret of Mr. Wright's presence in this apartment to the property owners' agents. I think that's absolutely true. But there seems to be some tension there. Mr. Wright was left off the rent rolls, which Mr. Gutman relied on, and also it was Gutman who claimed that he was defrauded, his company was defrauded, I should say. Excuse me, Your Honor. And let's talk first about the rent rolls. The first rent roll, and I believe that the first rent roll was dated February 10, 2006. It was several months before the closing and certainly long before Mr. Wright was in the apartment. So the probative significance of that first rent roll is really nothing. The second rent roll, the evidence about that rent roll was really so slim that it's hard to say what probative value that rent roll had either. There was no testimony about who produced it, who wrote it, where it came from, where it originated. Nobody, there was never any testimony. In fact, of the defendants who testified, the government never said to them, is this your handwriting on the rent roll? Did you produce this rent roll at the closing? Wasn't the first indication that there was something that wasn't Wright, was it a fellow named Fabish when he discovered that Wright was living there? Well, prior to Mr. Fabish coming in and seeing the, you know, he does a walk-through, he says he does a walk-through before the closing, and he doesn't see anybody in apartment 3W, and he does a walk-through after the closing and he sees Mr. Wright in apartment 3W. But there was no concealment from the other people who were involved in this transaction. The property owners before the sale to PBRG is the Ginkgo Company. The Ginkgo Company, they negotiate for Wright to come into the apartment, so they are obviously aware of Wright's presence in the apartment. McCann is their agent. Colin McCann testifies that he was the agent for the Ginkgo Company, so the original owner of that property. He then becomes the agent for PBRG. So there's no concealment from McCann. McCann knows about it when he's the agent for the original owner, and he knows about it when he's Gutman's agent. Mr. Teitelman, Mr. Chall, and Mr. Wright don't have control over what McCann is telling to Mr. Gutman. And Mr. Gutman did testify that he was a victim of this, of having a squatter in his apartment. Yeah, he was not happy. I guess he wasn't happy, right? But he may have been a victim of Mr. Fabish's. Mr. Fabish was his agent. Negligence. And Mr. Fabish was Mr. Gutman's agent, and Mr. McCann for a while was Mr. Gutman's agent. He may have been victims of their failure to inform him that Mr. Wright was there. That may be the omission. But Fabish's testimony on this point is really very helpful to the defendants because he says, I did a walkthrough before the closing. I did a walkthrough after the closing. There's no other specificity brought out in his testimony about the timing of those walkthroughs. We don't know if it's a minute before the closing or a month before the closing or a minute after. We don't know that. But putting that issue aside, he says he finds out that Chris, he sees Chris Wright. He calls Jason Morris, the real estate agent. Mr. Morris says, call Mr. Chawla. Mr. Chawla says, call Andy. He's Mr. Teitelman's friend. He'll tell you why he's there. And then Mr. Fabish testified that he had a telephone conversation with Mr. Teitelman. And Mr. Teitelman says, Mr. Wright is broke. He's in trouble. He's in the middle of a terrible divorce. He has no place to live. Let him live in your rundown apartment until you decide to renovate it and turn it into condos and, you know, we'll appreciate it or something. But he tells him those important facts. You know, there's no concealment from these people who are, you know, certainly have no sinister motive in not telling Mr. Gutman or somebody else that Mr. Wright is there. You know, McCann knows about it at the relevant time. The Rigdons know about it. And then Fabish finds out about it immediately. And so, you know, the government has charged concealment here, but they haven't proved concealment. I would just like to add one thing. Oh, I'm out of time, right? I would just like to add one thing, though, on the Palulo issue. Go ahead. One of the points that the government makes in its brief is that their case would be completely the same if they only had charged Count 12. It would have been a month-long trial with all this evidence proving corruption because they would have to prove all this, you know, this corrupt intersection. And, you know, I think that is clearly not correct because the motive for putting Mr. Wright into that apartment was friendship. And that is a sufficient motive to prove Count 12 if they had had concealment. They don't need an evil intent. And that was the argument made to the jury. Was that the argument? Yes. I think the jury was very confused by the prejudicial spillover of all the other evidence that came in. I mean, this jury seemed to know when to parse and when not to. At this point, why don't we hear from Ms. Williams, and we'll get whoever you want to come back on rebuttal. Thank you, Your Honor. Thank you very much. May it please the Court. My name is Jennifer Williams, and I represent the United States. I'd like to first address the argument by the defense that the government is solely on this temporal overlap to prove quid pro quo. Just something, when you look at this case, there's probably not a day or two that goes by that I don't think of my former colleague, now deceased, Judge Becker. And I can imagine Judge Becker in this case saying, I don't get it. I don't get it. I mean, you know, the guy's just doing what he's supposed to be doing, and people cut him some favors, and so why is the government indicting him here? What is the answer to the question from the grave? Well, Your Honor, the law says that there is bribery as long as a public official agrees to be influenced, even if nothing happens. Even Bryant said that if the public official is doing his job, and there's a corrupt intent there, an intent to influence, and an intent to be influenced, that is bribery. As I said, Bryant and Gallagher was a more stark case than this. This is a person who, in terms of constituent services, he went out and did the things he was supposed to be doing. He was also getting something on the side. The question is, was it friendship? Were they trying to put him in their pocket?  For example, had he been able to sell that one property and got a $6 million commission? It never happened. In this case, it looks as if you're saying that the public is entitled to this person's honest services, and they didn't get it, and Skilling says, guess what? That's a problem. You have to basically go under traditional bribery, and there's a lot of overlap. There's a lot of mixing and matching, and you've heard from our questions at the outset that the spillover context is the one that I know is troubling me, and I surmise it's both of my colleagues as well. Your Honor, if I first may address the first issue raised by Your Honor. Sure. On the issue of what was going on here. These were bribes. I have lots of dear friends, and I have never placed one of them in a free Center City apartment for a year and then made misrepresentations in a legal document in order to prolong their free stay. Well, not the fanciest place, and the person had alcohol issues, was in the middle of a nasty divorce. He had no money, essentially, and he had people that felt sorry for him. Yes, Your Honor, and the jury heard all of those arguments,  and the jury understands, just as the law understands, that politicians are not explicit when they bribe, that individuals and politicians are not explicit when they agree to a bribe. There are winks and there are nods, and that's exactly what Antico said on a whole line of cases. It is done by inferences. I remember Antico. Antico was, again, a much starker case. This case has a lot of nuance. Well, but I submit to the court that when the jury heard the whole record, it very clearly showed bribery. Mr. Wright, first of all, I would like to disagree with the statement by the defense that they made throughout the trial that Mr. Wright was simply doing what he would have done anyway. The evidence very clearly showed that Mr. Wright went above and beyond to be really at the beck and call of Mr. Chawla and Mr. Teitelman. They sent him very directive emails. Do this. Go there. Call me ASAP. Mr. Wright went above and beyond. He called individuals himself as opposed to having staff people do it. He got quick results. But at the end of the day, there was, you know, the votes taken by Mr. Wright's boss were votes that would have been taken anyway. Yes, Your Honor, and I don't think we want to decriminalize behavior by corrupt politicians who accept payments where there is an intent to influence and be influenced, even though the politician knows that he's just going to do what he would have done anyway. If a politician knows he's going to vote a certain way on a bill and some constituent says, I'm going to pay you $15,000 to get you to vote that way on the bill, I don't think we want to decriminalize that. There does not have to be – But there's no evidence that this politician, this councilman, did anything like that. You've got a chief of staff involved here. Understood, Your Honor, but the principle is the same. The principle is whether or not the government has to show in these corruption cases that the public official, in this case the chief of staff, actually changed his conduct or went about doing his regular conduct. They're paying for influence, right? I'm sorry? They're paying for influence. Yes, exactly. They're paying for influence. They're paying so that they have a chief of staff there to help them when they need help in whatever form it might come up. And they paid him in a big way. Why don't you go to the Palullo factors as to how Count 12 remains or the conviction on Count 12 remains despite the problems with Count 10? Yes, Your Honor. The government does concede that there were two witnesses presented at this trial whose testimony went solely to the undisclosed conflict of interest prong. Those witnesses were a state ethics witness and a local ethics law witness. They were not expert witnesses. They were fact witnesses. Every other piece of evidence that came in in this case would have come in on a trial solely on Count 12 because otherwise the alleged crime would not have made sense to the jury. The jury would hear that there were these two individuals, Mr. Chawla and Mr. Tuttleman, who put someone they knew in a free apartment for a year, even though it risked a multimillion-dollar contract to sell the property to PBRG by Robbie Chawla. Without the context of Councilman Kelly's position, Christopher Wright's position, the corrupt relationship that Wright had developed with Chawla and Tuttleman, all of the other benefits that were flowing to Wright and all of the other services Wright was doing for Chawla and Tuttleman, the fraud wouldn't make sense. It goes directly to motive, and the law is very clear that the government— But would you have gotten into the divorce and the legal services if it was just Count 12? Absolutely, Your Honor. It all goes to motive, and the law is generous with what motive evidence the government may admit. In this case, that proof of motive is necessary for the jury to understand the background of this crime, and it's directly relevant and would absolutely have been admissible. And the remaining evidence, the two fact witnesses who testified about the ethics laws, their testimony in no way influenced the jury's verdict on the mail fraud count. It was completely discrete, had nothing to do with mail fraud. The judge made it very clear in the instructions that it was a discrete issue. You're under the first Ploulot factor, intertwining. It looks like this jury, obviously, was there 14 counts, I believe, or so, convicted on only four. And on the two that are most likely on their face to be intertwined, 10 and 12, that's where they convicted. And it would seem that you've got to show now that whatever we put in on 10, we had separate evidence on 12, and that separate evidence on 12 was nowhere even possibly involved with Count 10, and therefore, Count 12, the conviction's at stand. Your Honor, I think Mr. Goldberger actually misstated the test somewhat when he said that there was an intertwining because the same... Well, I mean, that's one of the factors that you have of Ploulot. Yes, absolutely, Your Honor. Intertwining is relevant, but the fact that it's the same mailing, charged in Count 10 and charged in Count 12, that's not the kind of thing that would confuse the jury. The question is whether the evidence would have confused the jury and whether the presentation on any dismissed count was intertwined with... Well, this is where Count 1 really dovetails in with Count 2. Was the evidence on Count 12, that conviction, so distinct that there's no way you could say that it overlaps with what was presented with regard to Count 10? Well, Your Honor, I'd like to put it a little differently, if I may. I won't say, delete no way. The evidence certainly overlapped. For that reason, all of that evidence would have come in in a trial on Count 10. The way the instructions were given and the case was presented, the fact that there were honest services fraud counts should not have confused the jury and would not have confused a reasonable jury on the mail fraud count because they are distinct, they have distinct elements. But the evidence would have come in anyway, so there would have been no confusion. There was no improper intertwining. It was persuasive beyond a reasonable doubt presentation on the traditional mail fraud count and it doesn't matter that the same evidence was also relevant. How would your strategy, if you just had Count 12, that was it, how would your strategy have changed with regard to, what would you have deleted from what you presented with Count 10 as to Count 12? The only thing the government would have deleted from its presentation are the two ethics law witnesses. That's it. Everything else would have been introduced and admissible. Going to motive, going to intent, and going to the relationship between the parties. In one sense, what that brings us to the fourth factor is what did you say to the jury? For example, just here's some quotes. Opening argument, quote, the Challa brothers brought big, big properties, but they didn't buy them to develop them. Nope. They made a quick profit with no investment in time or rehabilitation. Opening argument as to Wright. He was seduced by that money, the free apartment, the potential for future wealth, seduction that eventually had become a full-blown affair. Closing argument. Chris Wright was bought and paid for to do their personal bidding, to be their personal public servant. Closing argument. Wright was the puppet of Ravi Hardeep and Teitelman's puppeteer and that they corrupted Chris Wright, corrupted him, so that he was no longer looking after the good of the city of Philadelphia. That's tough. That's strong language, Your Honor, but absolutely we would have made the same argument. That's honest services. What does it have to do with defrauding PBRG? It's the motive behind the fraud on PBRG. Ravi Challa had entered a contract with PBRG in which he agreed there would be no tenants without PBRG's approval. Ravi Challa was to earn $15 million, and his profit on that would have been somewhat less, but still multi-million dollars on that contract. The only way it makes sense why he risked all of that, why he would have risked his professional reputation, is because there was so much more at stake. Ravi Challa had Chris Wright in City Hall there to help him with millions of dollars worth of deals, and without an understanding of that, the jury could not understand the motive behind the fraud on PBRG. But in this case, just to look back, how successful was Wright in helping Tittleman and Challa? Tremendously, Your Honor, and actually one, I think, very illustrative example is the role that Mr. Wright played in helping Ravi Challa and Mr. Tittleman with the height restriction issue in River City. In River City. There was another councilman that presided over that area of the city. That was Councilman Clark. Well, he wasn't real happy. Yes, yes, but Mr. Challa and Mr. Tittleman didn't go to Councilman Clark. They went to Chris Wright and said, we need your help, and Chris Wright worked out an introduction with Councilman Clark. Because he was working for a pro-development councilman. I mean, he understood what his charge was, that we're trying to do development within the city to the extent we can. Yes, Your Honor, but Mr. Wright was there for every request that Ravi Challa made. Again, Mr. Wright's boss voted as part of the 15-0 to go along with the height restrictions. Yes, Your Honor, but again, the government doesn't have to prove that conduct was actually altered. The issue is whether there was an intent to influence, and Mr. Wright was there being influenced by the fact that every month he didn't have to pay $1,500 worth of rent. But let's go back to the point that there were, the concern that I have, that there were statements made to the jury that sound as if they could only relate to honest services. And, you know, obviously we're, you don't want to overturn a lengthy conviction unless there's a significant problem. And this looks like there's a significant problem. Well, Your Honor, the corruption aspect of all of this is what caused the defendants to defraud PBRG. That is the motive behind this large fraud on PBRG. Mr. Goldberger said a $20,000 real estate deal. It wasn't. It was millions upon millions of dollars, I believe $15 million. It was a big deal. The defendants- What do you mean? The free rent is worth how much? I'm sorry. The free rent was maybe $15,000 or $20,000. That's true. But Shawla was risking this large deal with PBRG by putting a tenant in against their contract and defrauding them to do so. Was he really risking the deal just by virtue of having somebody there that shouldn't have been there, according to Mr. Gutman? Well, the contract specifically said that he would not put a tenant in without telling Mr. Gutman. Mr. Gutman testified that the value of the property was based in large part on the vacancies because he wanted to convert it to condominiums. Certainly, Mr. Gutman testified that he would have wanted to know that a chief of staff of a public official was in the building, especially someone with no lease who was paying no rent. I do want to direct the Court's attention to the case law admitting evidence of motive. This Court and other courts very generously admit evidence of motive. There's one Third Circuit case. I apologize. I don't have the site with me, but the name of it is Sriyuth, S-R-I-Y-U-T-H. And in that Third Circuit case, the Court allowed, it was a kidnapping case, and the Court allowed in evidence that the defendant raped the kidnapping victim to show the motive for the kidnapping. Certainly, that's very prejudicial. Certainly, that's explosive evidence for the jury to hear. But it was admitted because it was an important part of the motive, and it is what makes the crime make sense to a jury. I submit that this would be no different, and all of those same arguments and evidence would have been admitted. How about skilling? Maybe we can turn to that. Thank you. What's the standard of review? You say plain error. Your adversary relies on the Black case and says no. Yes, Your Honor. We do say plain error, and the cases that we've cited in our brief indicate that the standard is plain error. In the end, I don't know that it really makes much of a difference because it all comes down to impact on the verdict. It is an objective test. I think the Fifth Circuit opinion in skilling, the remand, is a very instructive opinion. It makes it clear that all of the previous case law does still apply, and that it's an objective test, that there is no new trial if the evidence of honest services fraud bribery is so strong that no rational jury could have failed to convict on that basis. The government does meet that standard here. The governments read on the cases that that test, that test that says you can affirm a verdict even if alternative theories were presented and one is found later to be invalid, that test exists for a reason. It exists because it is not in the interest of justice to throw out a verdict that is firmly supported by all of the evidence, a good, strong verdict. All right. But, yeah, in this case, though, you've got a general verdict. And, I mean, doesn't that – I mean, I guess your argument is it should be a straight affirm, but isn't that tough when you've got a jury instruction on this conflict of interest? And, I mean, how do you square that? Well, Your Honor, it would not have made sense in a case like Riley. It would not have made sense in Coniglio. Those were cases that were tried on the conflict of interest theory, and later on the government tried to, I think one of the courts had put the cat back in the bag by changing really what the argument was. That's not what we have here. This was presented as a bribery case. The strength of the evidence is there. Well, I mean, obviously, and I cited before the closing. I mean, that's what you closed on, the government did. But still, I mean, the jury was charged with the conflict of interest theory as well. Yes, Your Honor, but the test exists for a reason. The law says that a verdict can be affirmed even if one of the alternative theories is later found to be invalid. That test exists for this case, Your Honor. In this case – Doesn't the fact that the jury acquitted on the official action counts undermine your argument? Absolutely not. Under Powell, the pattern of verdicts that the defense is relying so heavily on is not a consideration. And thank goodness, because it's impossible to know what a jury was thinking. A jury – Isn't that the problem within the honest services theory? We don't know what the jury relied on for those counts. Precisely, Your Honor, which is why it's an objective test. We don't have to interpret – the jury could have flipped a coin. They could have had one difficult person and they decided to reach a compromise. We should not be looking at what the jury was actually thinking about. It's an objective test. And in this case, Your Honor, I submit everything about the defendant's behavior was screaming bribery. And any jury looking at this evidence would have said, okay, yes, they're making an argument of friendship. But we're seeing all of these benefits going to right. The precise things he needs more than anything else. He's homeless. He needs a place to stay. He's getting a divorce. He needs free legal services. They gave him exactly what he needed. And in exchange, they were going to him for everything. And he was bending over backwards to help them. And the emails going back and forth showed the directive tone that Shawla and Teitelman took towards right. They showed that right was working to them. Everything they were doing indicated bribery. And I submit to the court, if it looks like a duck and sounds like a duck, a jury is going to find it's a duck. This was bribery. And the standard that says a verdict can be affirmed even if one of the alternative theories is found invalid exists for a case just like this. This case is very different from the 11th Circuit case that the defense was citing. I believe it's Siegelman. In that case, there were two counts that were referred to throughout the entire trial as the self-dealing counts. They weren't the bribery counts. There were bribery counts. There were self-dealing counts. Those were the self-dealing counts. And the court said, no, no, no, you can't now after the verdict come and say, but, well, those are also bribery counts. No. And so. Doesn't the same thing apply here? It doesn't, Your Honor, I submit, because of how the case was tried and how the case was charged. This was written. The indictment had benefits and it had official acts. It was written as a bribery indictment. It opened as a bribery case. It was tried as a bribery case. It was closed as a bribery case. At its very core, this was a bribery case, and that's why this is the kind of case that should be affirmed, even after Skilling took out the conflict of interest prong. It is not in the interest of justice to give the defendants a new trial just because the conflict of interest prong was taken out, because this was a bribery case. So you had a conviction on Count 10, which was problematic, and obviously evidence introduced with respect to that conviction. You had a conviction on Count 12, traditional fraud, for which you have evidence submitted, but you're saying that your strategy wouldn't have changed. It would have been the same but for one item. It looks like one can make an argument that all of the things, then, that convicted on one convicted on the other as well, right? I mean, just logically. I guess I don't understand. In other words, you're saying, I said, the third blue low factor, would your strategy have changed? You said, no, except for one item, we would have introduced the exact same evidence. But if you're introducing the exact same evidence on 10, and essentially, the exact same evidence on 12, and the jury convicts on both 10 and 12, how in the world are we to say that the jury wasn't influenced on 12 by virtue of what happened on 10? Because the jury was independently charged on the elements of mail fraud. Riley was a very similar case, and Riley, it was a traditional mail fraud count that was upheld. There's no doubt they were independently charged. But the evidence presented and statements made, you know, some of the statements made essentially said, look, this guy is messing around with the city of Philadelphia. That's honest services. And if that's the thing that caused them to be upset or to think that there was a violation, what's to make them not have that, use our words, spill over to the traditional claim? How do we go about being sure that the taint of one didn't leach on to the other? Because the evidence and the argument would have been the same. Because it would have been a corruption case, whether tried as an honest services fraud case or a traditional mail fraud case. It would have been charged really as a bribery. I'm sorry, tried as a bribery case, whether it was charged as an honest services fraud or as a traditional mail fraud. But you're saying this is how I intended it. You're saying this is how the judge instructed the jury. But based on things that were said at trial, how do we know that the jury wasn't influenced as to count 12 by virtue of the things that were said relating to count 10? That's the hurdle I've got, and I'm having trouble getting over it. And I'm sorry if I'm not expressing myself well. It's not you. It's a tough issue, and you're dealing with it extremely well. But you can be as good as you are, and still there's a problem. The reason that I can give the court is because the jury would have heard the very same words, even if this were only a trial on count 12. They would have heard the same arguments and evidence and the same words. So confusion is not an issue. How do we know that the jury wasn't influenced by some of the statements made that clearly relate to count 10, some of the statements made by counsel at trial, by some of the evidence submitted? How do we know that? I'm asking almost the we don't. That's the point. I don't think we can know it, can we? Well, we have to envision a hypothetical trial on just count 12. I think that is the standard. We need to look at what would have been tried if this were solely a trial on count 12. And that trial would have been the same trial absent those two ethics witnesses. It would have been the same trial. So there's no impact on the ultimate verdict on the mail fraud count because we would have repeated the same trial minus those two ethics witnesses on just the mail fraud count. So they would have had the same deliberations. They would have come to the same conclusion. Any other questions? Could you address the constructive amendment argument? Certainly. First, Your Honor, the standard for the constructive amendment argument is plain error. And the defense fails to satisfy this standard. The question is whether the defendant was convicted of the same conduct for which he was indicted. And I know the defense here today tried to argue that the in order to language in the indictment somehow doesn't allege bribery, except that in Kemp from this circuit, this court said that there are no magical words that are needed. There just needs to be language about an exchange. And there was ample language about an exchange. That's an argument that was not raised below. And I don't, I'm not even sure I completely understand it because this was charged as an exchange. It was an in order to case. There was another constructive amendment argument made in the briefs by the defense, which was not argued here today, that there was proof of essentially uncharged overt acts during the course of the trial, and that that somehow establishes a constructive amendment, except the case law is very clear that the government is permitted to prove uncharged overt acts. That does not cause a constructive amendment as long as there's not prejudice. And in this case, the defense really can't even argue that there was prejudice because the additional overt acts that were proved at trial were very consistent with the type alleged in the indictment, were about the same real estate deal as in the indictment. And there was nothing about that proof at trial that amended what the original charges were. In fact, count three of the indictment was about Chawla offering to retain Wright as a consultant to handle liaison work on the River City project. So introduction of evidence about overt acts taken in conjunction with the River City deal and the relationship between Chawla and Wright with regard to that River City deal was very consistent with the indictment. So the defense can't make out their burden on that. Okay. If the court doesn't have any other further questions, I will sit down. Thank you very much. Thank you very much. Ms. Mathewson. To take the last point first, Your Honors, we are not on plain error with respect to the real estate commissions and the constructive amendments on that topic. That was objected to below. Even on plain error, Your Honors, prejudice is presumed under the McKee decision when there is a constructive amendment. The last thing that this court should be doing now is diluting the charging language required for bribery. The court just a couple of weeks ago reaffirmed, again, the centrality of the intent to be influenced in the exchange. We're not asking for Latin, Your Honors. We're not asking for technical charging language. This indictment alleged a motive for the benefits. It didn't allege any mental state at all as to Mr. Wright, and a retrial would be barred on the bribery theory with the single exception of the $1,000 check, which was the sole item identified as a bribe. Ms. Arbuteer-Williams is trying to, I don't know if it's put the cat in the bag or not, but in the trial court, the government took the position that it had substantial evidence on both prongs of honest services fraud. That's what it said in the context of its opposition to our Rule 29. They're now telling the court, no, they didn't have substantial evidence of conflict of interest, that they tried this case solely as a bribery case. Coniglio is unpublished, but as Your Honor had started the argument with the observation that the government emphasized bribery here, but that is clearly not dispositive because the jury was told it could convict on either theory. And clearly the pattern of the verdict shows that they rejected all of the official action. This is not a Powell case, Your Honors. Powell is a collateral estoppel case arising out of inconsistent verdicts. We're not referring here to inconsistent verdicts. We're saying these verdicts were perfectly consistent. They were perfectly consistent in rejecting the government's theory that Mr. Wright had intended to exchange an official action for any of the things of value. With respect to the concerns about spillover, let's hypothesize a five-week jury trial on motive. We counted, Your Honor, we believe that there were 15 witnesses out of the 25 who related, who did not relate to the real estate transaction. The government's hypothesizing that a trial judge would allow under 404B and 403 a five-week trial about a separate federal crime that was not charged in a case involving somebody squatting in an apartment without paying rent. It's not persuasive, Your Honors, to think that a trial court would allow that and the rules of evidence would allow that. Not only, Your Honors, was the evidence on honest services fraud and the traditional mail fraud inextricably intertwined, but the jury instructions, which are quoted in Mr. Goldberger's brief from Mr. Chawla at page 61, illustrate as well that the court had combined the mail fraud theories for honest services and traditional mail fraud. That and the government's closing argument also relate to that intertwining. Lastly, Your Honors, I want to address Ms. Williams' point that the court should not decriminalize undesirable conduct. The court's not here to criminalize or decriminalize anything. It's here to apply in a constitutional way a statute that has caused problems for the courts since its enactment in the mid-1980s, and the Supreme Court has given it the mandate to construe it in a way that limits it to bribery. Ms. Williams said we shouldn't give politicians a pass just because they intend to keep doing what they've been doing all along. But if they intend to keep doing what they've been doing all along, Your Honors, they do not intend to alter. They do not intend to be influenced in their actions. Are they taking a gratuity? Is there a legislative fix that's required? I don't know the answer, Your Honors, but this court, in holding that the government's convictions cannot be sustained, would not be decriminalizing conduct. It would be constitutionalizing the prosecution. Thank you very much. Thank you to all counsel for exceptionally well-presented arguments and also exceptionally well-done briefs. It's a privilege to have people like you before us. Thank you. We'll take the matter under advisement. Thank you.